# IN THE UNITED STATES DISTRICT COURT
# FOR THE DISTRICT OF MARYLAND

ALYSSA POLACSEK, et al.          *
                                 *
         Plaintiffs              *
                                 *
v.                               *          Civil No. PJM 04-631
                                 *
DEBTICATED CONSUMER              *
COUNSELING, INC., et al.         *
                                 *
         Defendants              *

# <u>OPINION</u>

## I.

A key question in this case is whether a credit counseling agency (CCA)

is subject to the Credit Repair Organizations Act (CROA), 15 U.S.C. § 1679 *et seq*.

The Court holds that, depending on the circumstances, it may be. [1]

---

[1]    The matter is before the Court on Plaintiffs' Motion for Partial Summary Judgment.  There are two "First Amended Complaints" in this case, one filed by Class Plaintiff Alyssa Polacsek against Debticated Consumer Counseling, Inc., Debticated, Inc., Infinity Resources Group, Inc., DebtWorks, Inc., Eriks Pukke and Andris Pukke.  The other has been filed by Plaintiffs-in-Intervention Sarah Leoni, et al. against Debticated Consumer Counseling, Inc., DebtWorks, Inc., Eriks Pukke, Andris Pukke, Pamela Pukke, and The Ballenger Group, LLC.

Plaintiffs collectively have filed a Motion for Partial Summary Judgment as to the following Counts that the First Amended Complaints have in common:

The Court further holds, as a matter of law, that Debticated Consumer Counseling, Inc. (Debticated), the only CCA Defendant in this case, will be subject to CROA if it is determined at trial that, directly or indirectly, it operated *de facto* as a for-profit corporation.   The fact that Debticated or any CCA may have been organized as a non-profit corporation or that it may have been granted tax-exempt status by the Internal Revenue Service is not dispositive.

---

- •     Violations of the Credit Repair Organizations Act, 15 U.S.C. § 1679 *et seq.*;

- •     Violations of the California Consumers Legal Remedies Act, CAL. CIV. CODE. § 1750 *et seq.*;

- •     Violations of California's Unfair Competition Law, CAL. BUS. & PROF. CODE. § 17200 ; and

- •     Violation of a common-law fiduciary duty under California law.

Several preliminary observations are in order:

1)     Plaintiffs' make no motion as to Defendant Infinity (sued by Polacsek) or Defendant Pamela Pukke (sued by Polacsek and Leoni, et al.).

2)     Debticated, Inc. appears to be one and the same as Debticated Consumer Counseling, Inc. and has been effectively dropped as a separate Defendant.

3)     Plaintiffs have reached a settlement with Defendant The Ballenger Group LLC, which accordingly is no longer in the case.

4)     There is only one CCA Defendant in this litigation, *viz.* Debticated Consumer Counseling, Inc. Several other credit counseling agencies are mentioned in the pleadings but are not named as Defendants.  The Court does not understand Plaintiffs to be asking the Court to hold these non-party CCAs liable for CROA violations, nor, of course, could the Court find any basis to do so.

5)     Only Debticated and the non-Defendant credit counseling agencies, as well as DebtWorks, are potentially credit repair organizations within the meaning of CROA.  Individual Defendants Eriks and Andris Pukke will at most be liable for CROA violations if they are deemed to be "persons" within the meaning of 18 U.S.C. 1679(b)(a) or if they are deemed to so effectively control the CCAs that the corporate veils of the CCAs and/or DebtWorks should be pierced.  As discussed *infra*, the Court is not prepared to enter summary judgment as to the Pukkes individually on any issue at this time.

Thus, to the extent that Debticated is held subject to CROA, it may be held liable for such violations of the Act as may be demonstrated at trial, including the making of untrue or misleading representations with respect to its services, engaging in actual or attempted fraud or deception in connection with the offer or sale of their services, receiving improper payments in advance of their services, and furnishing contracts and notices lacking in requisite information.

## II.

According to a report prepared by the Permanent Subcommittee on Investigations of the Committee on Governmental Affairs of the United States Senate, the practice known as "credit counseling" was initiated by banks and credit card companies in the mid-1960's to deal with the problem of personal bankruptcies. [2] The companies providing the counseling were typically community-based, non-profit organizations offering a full range of counseling.  Trained counselors advised consumers about how to deal with their current financial situation, counseled them on budget planning, and educated them on how to avoid debt problems in the future.

A popular credit counseling option was the Debt Management Plan (DMP), in which the credit counselor would contact a consumer's unsecured creditors

---

[2]

PERMANENT SUBCOMM. ON INVESTIGATIONS, COMM. ON GOV'T AFFAIRS, UNITED STATES SENATE, PROFITEERING IN NON-PROFIT INDUSTRY: ABUSIVE PRACTICES IN CREDIT COUNSELING 3 (March 24, 2004).

and negotiate lower monthly payments, lower interest rates, and the waiver of outstanding late fees.  The consumer's lower payments would then be consolidated into a single payment and the consumer would send the single payment to the credit counseling agency, which would then distribute payments to each of the consumer's creditors.

These credit counseling agencies typically relied on contributions from creditors or small fees from consumers to cover operational costs.

Over time, a different business model developed, one in which non-profit CCAs authorized for-profit affiliates to take over so-called "back-office" services previously handled by the CCAs themselves, *i.e.* advertising, marketing, executive salaries, and any other activities apart from actual credit counseling services.  These back office processing companies collected revenues from the non-profit CCAs for their services.

Beginning in or about 1996, Defendant Andris Pukke and his wife Defendant Pamela Pukke were associated with a non-profit CCA known as AmeriDebt, Inc.  In 1999,  AmeriDebt became one of the non-profit CCAs that spun off its back-office and DMP processing functions to a for-profit entity, in this case DebtWorks, Inc., which was wholly owned by Andris Pukke.  Among other things

AmeriDebt and DebtWorks used the same law firm for legal services and for a time at least had common or adjoining office space.

While at first AmeriDebt was DebtWorks' sole client, eventually AmeriDebt officers, directors and employees fanned out to establish other CCAs, each of which entered into "fulfillment contracts" with DebtWorks to provide DMP processing services.  Among the other non-profit CCAs that came into existence and were serviced by DebtWorks were Debticated Consumer Counseling, Inc. and a number of CCAs that are not defendants in this case: A Better Way Credit Counseling, Inc., CrediCure, Inc., Mason Credit Counseling, Inc., Nexum Credit Counseling, Inc., Neway, Inc./Debtscape, Inc., The Credit Network, Inc., Visual Credit Counseling, Inc., PreActiv, Inc., FairStream, Inc., and DebtServe, Inc. (hereinafter the non-Defendant CCAs).  DebtWorks reported gross revenues from its activities of $2.1 million dollars in 1999, $15.4 million dollars in 2000, $38.0 million dollars in 2001, and $53.1 million dollars in 2002.

The evidence suggests that these CCAs were linked in various ways apart from their common connection with DebtWorks.  Several of the CCAs used the same legal counsel and had access to start-up loans from Defendant Infinity Resources Group, Inc., a private lending institution wholly owned and operated by Andris Pukke.  The CCAs also referred their consumers to Infinity for possible debt consolidation

loans.  Consumers paid Infinity a fee to have these loans processed and Infinity received interest on the loans it made.

At the end of 2002, Andris Pukke formed The Ballenger Group, LLC which purchased the DMP accounts and other assets of DebtWorks.  In 2003 Ballenger reported gross receipts of $37.4 million dollars, most if not all of which traced back to "contributions" made by consumers who enrolled in DMPs through the non-profit CCAs.

In the fall of 2001, Plaintiff Alyssa Polacsek (Polacsek), who was concerned about her credit situation, placed a phone call to Debticated.  She was immediately directed to Debticated's web pages of the Internet which she promptly accessed.  These web pages identified Debticated as a non-profit organization that could offer lower interest rates, eliminate over-the-limit fees, re-age past due accounts, improve credit ratings, and provide debt consolidation loans.  Among the materials eventually mailed to Polacsek was a benefits sheet indicating, in capital letters, that Debticated's program could "IMPROVE [HER] CREDIT."

Polacsek submits that she was reassured by the fact that she would be working with a non-profit as opposed to a profit-making organization.  She understood that the "counseling contribution" Debticated asked her to make -- equivalent to one payment on the Debt Management Plan -- would be used to cover

the "operational costs involved in setting up her account and negotiating with her creditors." She also understood that the monthly contribution solicited by Debticated "would be used to cover the cost involved in handling your creditors on a monthly basis." Polacsek did not understand from Debticated that her entire first payment would go to Debticated rather than her creditors.

In October 2001 Polacsek completed her application forms and sent them in to Debticated. She was never told that Debticated would be immediately transferring her file to DebtWorks or to any for-profit corporation for servicing, which in fact was what Debticated immediately did. When Polacsek called to inquire about issues concerning her account, DebtWorks employees, not Debticated employees, answered the phone. It was not until a few weeks after she had sent in her initial payment in to Debticated that Polacsek learned that the payment had been kept by Debticated and not sent to creditors.

Debticated and the non-Defendant CCAs operated in a fashion substantially similar to one another. Plaintiffs-in-Intervention Sarah Leoni and Greg Cavataio dealt with Debticated. Plaintiff-in-Intervention Felicia Robinson dealt with Neway and Debtscape.

In the present litigation, Plaintiffs collectively allege that the core deception of Debticated and the non-Defendant CCAs was that they operated as non-

profit corporations and that the consumers' "voluntary contributions" were going to cover the cost of setting up and negotiating consumer plans as set forth in the contracts between CCAs and their clients. Debticated in particular advertised that its program was "free" and that there was "no fee." Plaintiffs also contend that the CCAs were misrepresented their services when they claimed that they would "negotiate" with creditors on behalf of consumers and would "attempt to secure" debt consolidation loans which, according to Plaintiffs, were all but worthless.

Additionally, Plaintiffs allege that Debticated charged and received money for services before the services were fully performed and that Plaintiffs failed to receive the contracts or notices they were entitled to under CROA.

III.

Summary judgment is proper "if the pleadings, depositions, answers to interrogatories, and admissions on file, together with the affidavits, if any, show that there is no genuine issue as to any material fact and that the moving party is entitled to a judgment as a matter of law." Fed. R. Civ. P. 56; see also Celotex v. Catrett, 477 U.S. 317, 322 (1986). The burden is on the moving party to demonstrate the absence of any material issue of fact. Celotex, 477 U.S. at 323. Once the moving party satisfies his initial burden, the non-moving party "may not rest upon his allegations," but must present evidence demonstrating the existence of a genuine issue of material

fact for trial.  <u>Anderson v. Liberty Lobby, Inc.</u>, 477 U.S. 242, 248 (1986).  The court is obliged to view the facts and inferences drawn from the facts in the light most favorable to the non-moving party.  <u>Matsushita Elec. Indus. Comp. v. Zenith Radio Corp.</u>, 475 U.S. 574, 587-88 (1986).

IV.

Along with the growth of CCAs as described in Part II of this Opinion, companies came into being which promised to help repair the credit of consumers with poor credit histories.  Some of these companies "through advertisements and oral representations led consumers to believe that adverse information in their consumer reports [could] be deleted or modified regardless of its accuracy .... Under Section 605 of the [Fair Credit Reporting Act], however, accurate adverse information may be reported for 7 years, or in the case of bankruptcy, 10 years.  Therefore such representations by credit repair clinics [were] often misleading, and consumers, mostly low- and moderate-income individuals, [were] cheated out of money they paid for services."  *Consumer Reporting Reform Act of 1994*, H.R. REP. No.103-486, at 57 (1994).

A number of these credit repair organizations were found to have abused fair credit reporting procedures by "bombarding a credit bureau with requests for verification [of credit reports] with the hope that the bureau could not possibly be able

to verify the information within the time period given" for such verification under the Act. 134 CONG. REC. H6707 (Aug. 9, 1998) (statement of Rep. Annunzio).

In consequence, in 1996, Congress enacted CROA, which *inter alia* defined credit repair organizations, prohibited practices, and individual civil and administrative remedies for violations of the Act. 15 U.S.C. § 1679, *et seq*.

Congress prefaced the legislation with these findings and stated purposes:

**§ 1679.   Findings and purposes**

**(a)   Findings**

The Congress makes the following findings:

(1)   Consumers have a vital interest in establishing and maintaining their credit worthiness and credit standing in order to obtain and use credit. As a result, consumers who have experienced credit problems may seek assistance from credit repair organizations which offer to improve the credit standing of such consumers.

(2)   Certain advertising and business practices of some companies engaged in the business of credit repair services have worked a financial hardship upon consumers, particularly those of limited economic means and who are inexperienced in credit matters.

**(b)   Purposes**

The purposes of this subchapter are –

(1)   To ensure that prospective buyers of the services of credit repair organizations are provided with the

information necessary to make an informed decision regarding the purchase of such services; and

(2)    To protect the public from unfair or deceptive advertising and business practices by credit repair organizations.

15 U.S.C. § 1679.

Section 1679a(3) defines the term "Credit repair organization":

**§ 1679a.    Definitions**

\* \* \*

**(3)    Credit repair organization**

The term "credit repair organization"--

(A)    means any person, who uses any instrumentality of interstate commerce or the mails to sell, provide, or perform (or represent that such person can or will sell, provide or perform) any service, in return for the payment of money or other valuable consideration, for the express or implied purpose of –

(i)    improving any consumer's credit record, credit history, or credit rating; or

(ii)    providing advice or assistance to any consumer with regard to any activity or service described in clause (i); and

> (B)   does not include –
>
>> (i)   any non-profit organization which is exempt from taxation under section 501(c)(3) of [the Internal Revenue Code]....

15 U.S.C. § 1679a(3).

Section 1679b sets out certain prohibited practices:

**§ 1679b.   Prohibited Practices**

(a)   **In general**

> No person may –

* * *

> (3)   make or use any untrue or misleading representation of the services of the credit repair organization; or
>
> (4)   engage, directly or indirectly, in any act, practice, or course of business that constitutes or results in the commission of, or an attempt to commit, a fraud or deception on any person in connection with the offer or sale of the services of the credit repair organization.

* * *

(b)   **Payment in advance**

> No credit repair organization may charge or receive any money or other valuable consideration for the performance of any service which the credit repair organization has agreed to perform for any consumer before such service is fully performed.

15 U.S.C. § 1679b.

Finally, CROA establishes minimum requirements with respect to the contents of credit repair organization contracts, 15 U.S.C. § 1679d, and the right to cancel same.  15 U.S.C. § 1679e.

Although case law under CROA is not extensive, several cases have considered the extent to which the Act applies to different types of activities.  The U.S. District Court for Eastern District of New York in Limpert v. Cambridge Credit Counseling Corporation, 328 F. Supp. 2d 360 (E.D.N.Y. 2004), summarized these decisions:

> See Iosello v. Lexington Law Firm, 2003 U.S. Dist. LEXIS 14591 at *17-19 (N.D. Ill. Aug. 7, 2003) (applying the CROA to a law firm); Wojcik v. Courtesy Auto Sales, 2002 U.S. Dist. LEXIS 22731 at *21-26 (D. Neb. Nov. 25, 2002) (finding that the CROA may apply to a car dealership, but not doing so in that case); Parker v. 1-800 Bar None, A Financial Corp., 2002 U.S. Dist. LEXIS 2139 at *8-14 (N.D. Ill. Feb. 12, 2002) (applying the CROA to a financial services company that "regularly advertised in local news media that it ... can 'restore your credit'"); Bigalke v. Creditrust Corp., 162 F. Supp. 2d 996, 997-98 (N.D. Ill. 2001) (applying the CROA to a defendant that "regularly used the mails to provide or offer to provide consumers with a service, in return for money, which purports to improve the consumer's credit record"); White v. Financial Credit Corp., 2001 U.S. Dist. LEXIS 21486 at *14-18 (N.D. Ill. Dec. 27, 2001)(finding that the CROA did not apply to a debt collector); Vance v. National Benefit Ass'n, , 1999 U.S. Dist. LEXIS 13846 at *9-13 (N.D. Ill. Aug. 26, 1999) (applying the CROA to a bank); Nielsen v. United Creditors Alliance Corp., 1999 U.S. Dist. LEXIS 13267 at *7-9 (N.D. Ill. Aug. 23, 1999)(applying the CROA to a

> debt collector); <u>Sannes v. Jeff Wyler Chevrolet, Inc.</u>, 1999
> U.S. Dist. LEXIS 21748 at *3-12 (S.D. Ohio Mar. 31,
> 1999)(finding that the CROA did not apply to car
> dealerships); <u>In re National Credit Mgmt. Group, L.L.C.</u>, 21
> F. Supp. 2d 424, 457-58 (D.N.J. 1998)(applying the CROA
> to a defendant that "represented that, for a fee, they will
> provide a service that will assist consumers in improving
> their credit ratings").

<u>Id</u>. at 365 n.3.

In <u>Limpert</u> itself the court, in denying a motion to dismiss, held that the Act could apply to a CCA, depending on the particular allegations of the complaint.

Since <u>Limpert</u> was decided, the U.S. Court of Appeals for the First Circuit in <u>Zimmerman v. Cambridge Credit Counseling Corp.</u>, 2005 U.S. App. LEXIS 9901 (1st Cir. May 31, 2005), has also held the Act applicable to a CCA although, to be sure, there the applicability of the Act appears to have been conceded and the focus was on whether the grant of non-profit status to a CCA by the Internal Revenue Service was *ipso facto* sufficient to exempt the CCA under § 1679a(3)(B)(i) of the Act.  (It was held not to.)

In the present case, Defendants have raised four-square the issue of whether CROA can ever apply to a CCA.  They rely on the Act's legislative history for the proposition that it was only intended to regulate companies that deal with credit bureaus and which promise to repair credit histories, which Defendants say is not true of CCAs.  They point out that nowhere does the legislative history mention

CCAs much less evidence an intention to make them subject to the Act.  Plaintiffs

argue that the plain language of CROA makes it applicable to CCAs and that nothing

in the Act exempts them from its provisions.  The Court agrees with Plaintiffs.

It is apparent that both credit repair organizations and CCAs share a

common objective, namely to help distressed consumers improve their credit

situations, even if some of their techniques for doing so may differ.  As the <u>Limpert</u>

court observed:

> there is a fine line, in advertising and soliciting for credit
> counseling services to an unsophisticated audience of
> lower-income debtors, between promising future rewards
> for credit worthiness, and implying that existing bad credit
> records may be prematurely expunged.

328 F. Supp. 2d at 364.

In this respect, this Court believes the district court in <u>Limpert</u> got it

right. [3]  Depending upon the allegations of the Complaint, a CCA may be covered by

CROA, which is simply another way of saying that an organization does not

necessarily have to be wholly either a credit repair organization or CCA.  It may in

fact share characteristics of both.  Arguably an entity's credit repair activities will be

so ancillary to its counseling activity as to be *de minimis* and therefore not subject to

---

[3] This Court, however, does not agree with the <u>Limpert</u> Court insofar as it held that non-profit status of a corporation under the Internal Revenue Code *ipso facto* exempts the corporation from CROA coverage. Instead the Court follows the First Circuit's holding in <u>Zimmerman</u> that, to be exempt from CROA, the corporation must be exempt from tax under § 501(c)(3) and actually operate as a non-profit.

CROA.   But where, as a substantial part of its activity, a CCA, using an instrumentality of interstate commerce, undertakes for pay to sell, provide or perform any service to improve a consumer's credit record, credit history, or credit rating, CROA literally and ineluctably applies.

There is a ready answer to the argument that because legislative history suggests that pure CCAs were not originally targeted by the Act, only those organizations originally targeted are covered.  It was frequently contended that the Racketeer Influenced and Corrupt Organizations (RICO) Act 's private action treble-damages provision applied only to defendants who had been convicted of criminal charges and only when a "racketeering injury" had occurred.  The Supreme Court, however, put this notion to rest in <u>Sedima v. Imrex Co.</u>:

> Underlying the Court of Appeals' holding was its distress at the "extraordinary, if not outrageous," uses to which civil RICO has been put.  Instead of being used against mobsters and organized criminals, it has become a tool for everyday fraud cases brought against "respected and legitimate 'enterprises.'"  Yet Congress wanted to reach both "legitimate" and "illegitimate" enterprises.  The former enjoy neither an inherent incapacity for criminal activity nor immunity from its consequences. The fact that § 1964(c) is used against respected businesses allegedly engaged in a pattern of specifically identified criminal conduct is hardly a sufficient reason for assuming that the provision is being misconstrued.  Nor does it reveal the "ambiguity" discovered by the court below. "[The] fact that RICO has been applied in situations not expressly

anticipated by Congress does not demonstrate ambiguity. It demonstrates breadth."

It is true that private civil actions under the statute are being brought almost solely against such defendants, rather than against the archetypal, intimidating mobster.   Yet this defect -- if defect it is -- is inherent in the statute as written, and its correction must lie with Congress.  It is not for the judiciary to eliminate the private action in situations where Congress has provided it simply because plaintiffs are not taking advantage of it in its more difficult applications.

473 U.S. 479, 499-500 (1985) (citations and footnotes omitted).

To similar effect was the Supreme Court's holding in <u>H.J. Inc. v.</u>

<u>Northwestern Bell Telephone Co.</u>:

As this Court stressed in <u>Sedima</u>, in rejecting a pinched construction of RICO's provision for a private civil action, adopted by a lower court because it perceived that RICO's use against non-organized-crime defendants was an "abuse" of the Act, "Congress wanted to reach both 'legitimate' and 'illegitimate' enterprises."   Legitimate businesses "enjoy neither an inherent incapacity for criminal activity nor immunity from its consequences"; and, as a result, §§ 1964(c)'s use "against respected businesses allegedly engaged in a pattern of specifically identified criminal conduct is hardly a sufficient reason for assuming that the provision is being misconstrued." If plaintiffs' ability to use RICO against businesses engaged in a pattern of criminal acts is a defect, we said, it is one "inherent in the statute as written," and hence beyond our power to correct.   RICO may be a poorly drafted statute; but rewriting it is a job for Congress, if it is so inclined, and not for this Court. There is no more room in RICO's "self-consciously expansive language and overall approach" for the imposition of an organized crime limitation than for the "amorphous

> 'racketeering injury' requirement" we rejected in <u>Sedima</u>.
> We thus decline the invitation to invent a rule that RICO's
> pattern of racketeering concept requires an allegation and
> proof of an organized crime nexus.

492 U.S. 229, 249 (1989) (citations omitted).

The same may be said of CROA.  While perhaps aimed primarily at pure credit repair organizations, the scope of its language also makes it clearly extendible, under appropriate circumstances, to CCAs.  If the language of the Act reaches too far, it is for Congress – not the Court – to take corrective action.

The Court holds that, depending on the circumstances and assuming they are not otherwise exempt as non-profit corporations under 15 U.S.C. § 1679a(3)(B)(i), CCAs may be subject to CROA.

## V.

Apart from whether Debticated and the non-Defendant CCAs are exempt from CROA by reason of their non-profit status, the Court also holds as a matter of law that in the case at bar at all relevant times they functioned in substantial part as credit repair organizations. [4]

---

[4]

The Court holds that DebtWorks, which was at all relevant times a for-profit corporation, provided and performed credit repair services and was a credit repair organization in its own right.  Clients did not have contact with their CCAs after enrolling with them, but with DebtWorks.  DebtWorks fulfilled the DMP services that the CCAs had committed to provide to consumers.  It also provided forms and controlled information in setting up the clients' accounts. Its scripts instructed its representatives about how to advise clients about the re-aging of accounts,

A.     All the CCAs used instrumentalities of interstate commerce in connection with their activities.  Their "benefits sheets" told consumers how to reach the CCAs by wire (telephone and on the web) and by mail.  Their form contracts also evidenced their use of wire and mail commerce.  For its part, DebtWorks bound itself to use the U.S. mail in its fulfillment agreements, in which it defined the services it offered and how they would be delivered.

---

and it contacted creditors and credit bureaus on behalf of consumers who had accounts with the CCAs.  DebtWorks' status as a credit repair organization is beyond dispute.

DebtWorks may also qualify under § 1679b(a) of CROA, as a "person" who:

>    (3)  ma[de] or used untrue or misleading representation of the services of the credit repair organization; or
>
>    (4)  engage[d], directly or indirectly, in any act, practice or course of business that constitutes or results in the commission of, or an attempt to commit, a fraud or deception on any person in connection with the offer or sale of the services of the credit repair organization.

18 U.S.C. § 1679b(a).

To the extent that Andris Pukke and Eriks Pukke effectively controlled DebtWorks, Debticated, or one or more of the non-Defendant CCAs and participated in or acquiesced in violations of CROA by these entities, they may be held individually subject to the Act.  See, e.g., Tillman v. Wheaton-Haven Recreation Ass'n, 517 F.2d 1141, 1145 (4th Cir. 1975) ("It is the general rule that if an officer or agent of a corporation directs or participates actively in the commission of a tortious act or an act from which a tort necessarily follows or may reasonably be expected to follow, he is personally liable to a third person for injuries proximately resulting therefrom." (quoting Lobato v. Pay Less Drug Stores, 261 F.2d 406, 409 (10th Cir. 1958)).

As discussed infra, while there is ample evidence that Andris Pukke in fact exercised effective control over these and that Eriks Pukke played a similar role at least vis-a-vis Defendant Debticated, the Court declines to make those findings on summary judgment.  The issues of their control vel non will be determined at trial.

B.   All the CCAs also sold credit repair services.  Debticated's "benefits sheet" typifies those of all the non-Defendant CCAs.   In this sheet, Debticated expressly promised that its services would "IMPROVE CREDIT" (boldface in original) by "reaging accounts" which would "improve your credit rating" under its agreements with other entities.  In its standard introductory letter to clients, Debticated repeated the promise:

> Unlike other debt management companies, we provide you with very important "back-end services" to help keep your credit protected and clean.  Our credit report review will make sure you are not being mismarked (*sic*) with someone else's debt.

As for DebtWorks, it clearly provided credit repair services when it took over the DMP Services for the CCAs' budget plan clients, including preparing proposals to creditors, communicating with creditors, and receiving, and depositing and disbursing client budget plan payments.

C.   Debticated, the non-Defendant CCAs, and DebtWorks, moreover, sold, performed and provided credit repair services in return for the payment of money.  Although in their client contracts, the CCAs attempted to disavow "advance fees," they routinely inserted language in their contracts whereby the consumer was asked to affirm, as for example in Debticated's contract,  that

> I understand that I have been requested and voluntarily agree to make a one-time non-refundable 'counseling'

contribution to [the CCA] equivalent to one payment on the debt management program that will be procured from my first payment.   I understand that the "counseling" contribution will be used to cover the operational costs involved in setting up my account and negotiating with my creditors.

The agreements further solicited a voluntary "monthly contribution" of a determined amount, *e.g.* of $6.00, "to cover the costs involved in handling my creditors on a monthly basis."  These were purportedly payments to be made to non-profit corporations.   But unbeknownst to the consumers the payments almost immediately passed through to DebtWorks, a for-profit corporation, which then undertook to provide the counseling services promised by the CCA.

Additionally even though these contracts declared the supposedly "voluntary" nature of the "contributions" and that the CCAs would provide assistance whether or not the "contributions" were made, it is apparent that the "contributions" were not of the type ordinarily associated with purely non-profit corporations.  First and foremost, they were not tax-deductible.  As DebtWorks told its counselors to answer in response to one of the Frequently Asked Questions asked by consumers: the "monthly and one time enrollment contribution[s]" are not tax deductible, because

"we provide a service for contributions."  In other words, the "contributions" were payments for services.  [5]

For these reasons, unless by virtue of their tax exempt status under the Internal Revenue Code they are *ipso facto* exempt from CROA, the CCAs in this case fit all the criteria to be covered by the Act.

VI.

A non-profit corporation which is exempt from taxation under § 501(c)(3) of the Internal Revenue Code is exempt from CROA.  15 U.S.C. § 1679a(3)(B)(i).  Such a corporation, however, must be "organized and operated exclusively for religious, charitable, scientific, testing for public safety, literary, or educational purposes ... no part of the net earnings of which inured to the benefit of any private shareholder or individual." 26 U.S.C. § 501(c)(3).  According to the Code of Federal Regulations:

> (1)     In order to exempt as an organization described in Section 501(c)(3), an organization must be both organized and operated exclusively for one or more of the purposes specified in such section.  If an organization fails to meet

---

[5]

A standard disclaimer in the CCA contracts states that the CCA "makes no claims to improve or remove any credit reference on any client's credit report."

This language, obviously intended to avoid the strictures of CROA, cannot cure the extensive representations made by the CCAs that credit repair was a principal benefit of the services.  Not only can it not disavow what was expressly being promised, Scotts Co. v. United Indus. Corp., 315 F.3d 264, 276 & n.4 (4th Cir. 2002); such language would be an ineffective waiver under CROA.  *See* 15 U.S.C. § 1679f(b).

either the organizational test or the operational test, it is not exempt.

26 C.F.R. § 1.501 (c)(3)-1(a)(1).

The CFR continues:

(b)    *Organizational test* --

\* \* \*

(5)    *Construction of terms*.  The law of the State in which an organization is created shall be controlling in construing the terms of its articles.

(c)    *Operational test* –

\* \* \*

(2)    *Distribution of earnings*.  An organization is not operated exclusively for one or more exempt purposes if its net earnings inure in whole or in part to the benefit of private shareholders or individuals.

(d)    *Exempt purposes* –

(1) *In general*.

\* \* \*

(ii)    An organization is not organized or operated exclusively for one or more of the purposes specified in subdivision (i) of this subparagraph unless it serves a public rather than a private interest.  Thus, to meet the requirement of this subdivision, it is necessary for an organization to establish that it is not organized or operated for the benefit of private interests such as designated individuals, the creator

-23-

> or his family, shareholders of the organization, or
> persons controlled, directly or indirectly, by such
> private interests.

26 C.F.R. § 1.501 (c)(3)-1.

Plaintiffs submit that neither Debticated nor the non-Defendant CCAs actually operated as non-profits. Substantial earnings of Debticated, for example, inured to the benefit of Andris Pukke, a private individual; in 2001 alone, 43.8% or $3.9 million of Debticated's total revenue dollars ultimately found its way to him. Defendants take the position that CROA does not apply to the CCAs in any respect because all the CCAs are exempt by reason of the § 501(c)(3) non-profit corporation status accorded them by the IRS.

The Court finds Defendants' argument unpersuasive. By the implicit language of the Internal Revenue Code and the explicit language of the Code of Federal Regulations, a corporation must not only be organized as a non-profit, it must actually operate as one. To the extent that it does not, it may be held subject to CROA whether or not the IRS has granted it § 501(c)(3) status. *See Zimmerman*, *supra*. If this were not so, a credit repair organization, having once gained § 501(c)(3) status,

could engage in outrageous credit repair abuses without impediment until such time as the IRS might act. [6]

The Court therefore finds that § 501(c)(3) status of the CCAs is not *ipso facto* dispositive of whether a CCA is exempt from CROA. The Court is obliged to consider whether in operation they truly functioned as such. For present purposes, the question is whether the Court should make this determination as a matter of law.

As with most of Plaintiffs' case, there is a wealth of evidence suggesting that the CCAs that have done business with DebtWorks, and through it arguably with Andris Pukke and/or Eriks Pukke, have, to a considerable degree, operated in "for-profit" fashion. The Court is not prepared at this juncture, however, to reach this conclusion as a matter of law. The Court cannot say categorically that all or even a substantive portion of the CCAs payments to DebtWorks were inappropriate or unreasonable or indeed that executives of the corporations necessarily knew that substantial revenues of DebtWorks were being passed through to Andris or Eriks Pukke. The more cautious approach, in the Court's view, especially in light of the fact that the CCAs apparently still possess § 501(c)(3) status, is to let the trier of fact determine whether in actuality they functioned as for-profit entities.

---

[6]

In fact, the Court has been advised that since this litigation began, the IRS determined that AmeriDebt's § 501(c)(3) status should be revoked.

VII.

Plaintiffs also ask the Court to grant them summary judgment with respect to several other aspects of their CROA claims, for instance, as to:

(i)     the common-enterprise relationship among all the Defendants and the non-Defendant CCAs;

(ii)    Eriks Pukke's *de facto* control of Debticated;

(iii)   Andris Pukke's *de facto* control of all the Defendants and the non-Defendant CCAs;

(iv)    the violations committed by Debticated and DebtWorks; and

(v)     the damages sustained by Plaintiffs.

Again Plaintiffs' evidence as to these matters is strong.   Internal documents and deposition testimony of knowledgeable individuals definitely tend to support Plaintiffs' contentions.  Eriks Pukke, for instance, has executed a stipulation to the effect that he is the only individual able to testify a universe of matters pertaining to Debticated. [7]  But since Eriks Pukke has taken the Fifth Amendment and

---

[7]
        These matters include (1) the identity of Debticated's officers, directors, advisors, consultants, and the activities and duties of each; (2) Debticated's creation and incorporation; (3) its decision to file an application for a § 501(c)(3) tax statement with the IRS; (4) advertising which Debticated engaged in from its inception; (5) income that Debticated received from its inception; (6) Debticated's fee structure; (7) any and all expenses incurred by Debticated; (8) Debticated's relationship with Eriks Pukke, Andris Pukke, Pamela Pukke, and The Ballenger Group, among others; (9) Debticated's policy and procedures; (10) the salaries of Debticated's officers, directors, key employees, etc.; (11) contracts provided to Debticated's customers, (12) the creation and storage

has declined to respond to any of these inquiries during discovery, either as to

Debticated or as to himself individually, negative inferences may be drawn against

both the organization and the individual.  See Id. Baxter v. Palmigiano, 425 U.S. 308,

319-20 (1976); In re Grand Jury Subpoena, 836 F.2d 1468, 1472 (4th Cir. 1988).

Similarly, since Andris Pukke has invoked his Fifth Amendment right

and has declined to provide information relative to his involvement in any of the

transactions that underlie this suit, negative inferences may also be drawn to him.  Id.

But the drawing of negative inferences from Fifth Amendment silence

is permissive only, not mandatory.  Id.  Moreover, at least to some extent an argument

can be made that Debticated and DebtWorks functioned independently of

independence of the Pukkes; and that at least some of their alleged CROA violations

(viz. untrue and misleading representations; the receipt of money for consumer

services before the services were fully performed; and the failure to provide

consumers with contracts or notices that satisfy CROA) are open to non-inculpatory

explanations. [8]   Plaintiffs have served up a full plate of supposedly conclusive

---

of information related to Debticated's business; (13) the identity of Debticated's former customers;
(14) the location of Debticated's assets; (14) the relationships between Debticated's officers,
directors, advisors and consultants with Andris and Pamela Pukke and their family; (15)
Debticated's daily operation; and (16) Debticated's interactions with its customers and/or its
customers or creditors.

[8]    Defendants argue that the CCAs in this case are separate, distinct and independently managed
entities, that each has its own management, its own employees, its own office space and they do not jointly

arguments with respect to the organizational Defendants and the non-Defendant CCAs – how they were formed, where they maintained their offices, what services they performed, how they maintained their books, and who actually ran them. But deciding multiple issues such as these as a matter of law is a risky business. One or more erroneous calls by the Court and substantial portions of the case, if not all, could be back in Court to be retried in the future. The better part of wisdom, in the Court's view, is to let the trier of fact pass upon these issues, if need be by answering special interrogatories pertaining to precisely who represented what to consumers; whether consumers were likely misled; whether consumers received the contracts and notices they were entitled to; whether and to what extent promised services were or were not performed; whether Andris and/or Eriks Pukke exercised *de facto* control over the organizational entities and, if violations occurred, the extent to which each of the Plaintiffs was damaged. [9]

Accordingly, the Court declines to enter summary judgment on any aspects of Plaintiffs' CROA claim, except insofar as it has held the Act potentially

---

commingle their funds. To some extent the CCA documents submitted by Plaintiffs themselves suggest this.

[9]    Among others, the issue of common enterprise will be tried as part of the Federal Trade Commission suit against AmeriDebt, DebtWorks, Andris Pukke and Pamela Pukke, which has been consolidated for trial with the present litigation. See FTC v. AmeriDebt, Inc., et al., Civil No. PJM 03-3317.

applicable to CCAs in general and specifically applicable to any CCAs in this case which may be found to have in fact operated as a for-profit corporations.

## VIII.

For the same reasons the Court denies Plaintiffs' Motion for Partial Summary Judgment as to their claims of Defendants' violations of CROA, it denies their Motion insofar as it pertains to claims under California's Consumers Legal Remedies Act of unfair or deceptive practices in transactions relating to the sale of goods or services to a consumer; their claims under California's Business and Professions Code of unlawful and/or unfair and/or fraudulent business acts; and their claims of breach of fiduciary duty under California law and their claims of a common-enterprise relationship among the Defendants.   Despite Plaintiffs' compelling evidence in regard to these matters, the variations are too multifarious and complex to be resolved on summary judgment.  Precisely which acts Plaintiffs claim to have been "unfair," "deceptive," or "fraudulent" are better left to the trier of fact. Similarly, while it is possible that fiduciary obligations may arise out of relationships based on the facts of a given case and do not necessarily have to fit the traditional molds of trustee, guardian, or attorney, it remains more appropriately the province of the trier of fact to determine on the particular facts of this case whether or not that such a relationship exists or existed.  See, e.g., Kudokas v. Balkus, 103 Cal. Rptr. 318,

321 (Ct. App. 1972) ("Existence of a confidential or fiduciary relationship depends on the circumstances of each case and is a question for the fact trier."); <u>Aagard v. Palomar Builders, Inc.</u>, 344 F. Supp. 2d 1211, 1220 (E.D. Cal. 2004) (same).

The Court therefore DENIES Plaintiffs' Motion for Partial Summary Judgment insofar as it claims violations of the California Consumers Legal Remedies Act, the California Business and Professions Code, and of any fiduciary obligation under California common law.

IX.

A separate Order implementing this Opinion will issue.

_____/s/_____

**PETER J. MESSITTE**

**November 23, 2005**          **UNITED STATES DISTRICT JUDGE**